IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Case No. 19-cv-03027-PAB-STV

WARMING TRENDS, LLC f/k/a FLAHERTY HOLDINGS, LLC, a Delaware limited
liability company,

      Plaintiff,

v.

RAY STONE, an individual,
FIREFLY PATIO & HEARTH, LLC, a Colorado limited liability company,
BSG, LLC HOLDINGS d/b/a BSG HOLDINGS, LLC and FIREFLY PATIO & HEARTH, a
Colorado limited liability company, and
AMD DIRECT, INC. d/b/a SUMMERSET PROFESSIONAL GRILLS and FIREGEAR
OUTDOORS, a California limited liability company,

      Defendants.

_____

**ORDER**
_____

      This matter is before the Court on Firefly Defendants' Motion for Summary

Judgment [Docket No. 274] and Plaintiff Warming Trends, LLC's Motion for Summary

Judgment [Docket No. 276].  The Court has jurisdiction under 28 U.S.C. § 1331.

## I.    BACKGROUND

      Defendant Ray Stone has over forty years of experience working with gas pipes

and systems.  Docket No. 274 at 5, ¶ 19.  Mr. Stone initially worked as a plumber and

later in his career began building outdoor gas fireplaces.  *Id*.  In 2007, Mr. Stone

acquired a company that manufactured gas burners and he began operating the

company, Rock Enterprises ("Rock").  *Id*., ¶ 20.  On August 24, 2015, Mr. Stone

transferred 40 percent ownership of Rock to Mike Windemuller.  Docket No. 276 at 4,

¶ 1.  After the transfer, Mr. Stone assumed the role of president at Rock through an

employment agreement. *Id.*, ¶ 2.  By December 2015, Rock had three co-owners: Mr. Stone, Mr. Windemuller and Divo Catozzo.  Docket No. 274 at 5, ¶ 21.  On December 28, 2015, Mr. Stone signed a Confidentiality Agreement and Non-Disclosure Agreement ("2015 Agreement") regarding his employment with Rock.  Docket No. 276 at 4, ¶ 3.  The 2015 Agreement contains a non-compete and non-solicitation provision. *Id.*, ¶ 5.  On January 11, 2017, Mr. Stone entered into a Settlement Agreement ("2017 Agreement") and sold his remaining shares in Rock to Mr. Windemuller and Mr. Catozzo.  Docket No. 274 at 5, ¶ 25.  In the 2017 Agreement, Mr. Stone agreed that the non-solicitation and non-compete provision of the 2015 Agreement would expire on January 11, 2019. *Id.*, ¶ 26.  After the 2017 Agreement was signed, a dispute arose, with each side believing the other had breached the agreement. *Id.* at 6, ¶ 28.  On April 2, 2018, plaintiff Warming Trends, LLC acquired Rock.  Docket No. 276 at 5, ¶ 7.  In May 2018, without either side admitting liability, Mr. Stone entered into a settlement agreement with Warming Trends ("2018 Agreement").  Docket No. 274 at 6, ¶ 29.  The 2018 Agreement extended the non-compete provision from January 11, 2019 to April 2, 2019.  Docket No. 276 at 5, ¶ 11.

Beginning in late 2018, Mr. Stone began preparing to enter the marketplace once his restricted period ended.  Docket No. 293 at 9, ¶ 10.  In November 2018, Mr. Stone requested quotes from manufacturers of brass parts, commissioned drawings of brass burner designs, and sent drawings of brass burner components to potential manufacturers.  Docket No. 301 at 11, ¶ 3; Docket No. 321 at 3.  By September 2018, Mr. Stone was manufacturing and offering steel log sets for sale.  Docket No. 276 at 6,

¶ 16.[1]  Warming Trends offered for sale and sold steel log sets during Mr. Stone's employment with the company through the present day, and Mr. Stone was aware of these facts.  *Id.* at 6-7, ¶ 17.  On or around September 2018, Mr. Stone told Chad Hetherington that he had a non-compete agreement with Warming Trends.  *Id.* at 7, ¶ 18.  Before April 2, 2019, Mr. Stone designed brass burners, sought out potential partners and funding, and secured equipment to manufacture brass burners to compete with Warming Trends.  Docket No. 301 at 11, ¶ 7; Docket No. 321 at 3.

Mr. Stone is the owner of Firefly Patio & Hearth, LLC ("Firefly"), and he is the majority owner and principal of BSG, LLC, Holdings ("BSG") (collectively, the "Firefly defendants").  Docket No. 276 at 7, ¶ 24.  Firefly and BSG conduct business using the tradename "Firefly Patio."  *Id.* at 8, ¶ 25.  On June 19, 2019, Mr. Stone filed a new patent application for a "Brass Burner System and Method" ("the '968 application").  *Id.*, ¶ 27.  By September 6, 2019, the Firefly defendants launched a new Firefly Patio website, advertising "Firefly's patented SEALTITE Jets."  *Id.*, ¶ 28.  By October 2019, the Firefly defendants began offering their new brass burners for sale.  *Id.* at 9, ¶ 36.  The 2019 Hardscape North America Exposition (the "HNA Expo"), one of the largest trade shows in the fire features industry, occurred on October 16-18, 2019 and was attended by many of Warming Trends' customers and distributors.  *Id.* at 8, ¶ 29.  The Firefly defendants prepared materials for the HNA Expo, advertising Firefly Patio's new brass burners with "Patented Sealtite Jets."  *Id.*, ¶ 30.  At the HNA Expo, the Firefly defendants had a booth, displaying that their products had "Patented Sealtite Jets."  *Id.*,

---

[1] The Firefly defendants admit this fact in part and deny the fact in part.  Docket No. 293 at 5, ¶ 16.  The Court deems this fact undisputed for the reasons set forth in section III(B)(1)(c) of this Order.

¶ 31.  At the time of the HNA Expo, the Firefly defendants had a patent pending on the jets of the burners.  Docket No. 274 at 7, ¶ 38; Docket No. 301 at 7, ¶ 38; Docket No. 321 at 2, ¶ 38.  To date, the '968 application remains unpublished.  Docket No. 276 at 9, ¶ 39.

Warming Trends owns two patents related to brass burners: U.S. Patent No. 10,571,117 ("the '117 patent"), issued on February 25, 2020, and U.S. Patent No. 11,193,670 ( "the '670 patent"), issued on December 7, 2021.  Docket No. 274 at 2-3, ¶ 5.  The '117 patent includes one independent claim and eighteen dependent claims, which offer variations on the independent claim.  *Id.*, ¶ 10.  Claim 1 of the '117 patent, the independent claim, states

> A modular burner system comprising:
> a plurality of burners, at least two of the burners including a nipple that is brass
>     and a jet that is brass;
> in each of the at least two of the burners:
> the nipple has a first end that is threaded and a second end that is closed;
> the nipple has a side wall between the first end and the second end, the side wall
>     defining a bore, the bore extends through the first end to the second end;
> the first end, second end, and side wall of the nipple are of integral, one
>     piece, construction free of joints;
> the nipple has a threaded hole extending through the side wall of the nipple to
>     the bore; and
> the jet has a threaded end threadedly engaged with the threaded hole.

*Id.* at 3-4, ¶ 11.  Claim 1 of the '117 patent application initially stated that "the first end, second end, and side wall of the nipple are one piece."  *Id.* at 4, ¶ 12.[2]  To overcome an initial rejection on the grounds of obviousness in view of prior art, Warming Trends

---

[2] Warming Trends states that Claim 1 as initially filed did not include the cited language. Docket No. 301 at 3, ¶ 12.  The Court deems this fact undisputed because Claim 1 in the '117 patent application was initially numbered Claim 5 and Claim 5 contained the language: "the first end, second end, and side wall of the nipple are one piece."  *See* Docket No. 321 at 1, ¶ 12; Docket No. 274-6 at 4, 7.

added the underlined language: "the first end, second end, and side wall of the nipple are of integral, one piece, construction." *Id.*, ¶ 13.  In response to another rejection, Warming Trends added the underlined language: "the first end, second end, and side wall of the nipple are of integral, one piece, construction free of joints." *Id.*, ¶ 15.  In its interview with the United States Patent and Trademark Office, Warming Trends conceded that a burner with a welded end cap includes a joint.  *Id.*, ¶ 16.

The '117 patent cites two problems with prior art, including scarring and marring on the pipe surface and unreliable seals at the joints.  *Id.* at 3, ¶ 7; Docket No. 301 at 3, ¶ 7.  One of the ways that the '117 patent purports to solve these two problems is by using a pipe ("nipple") with one end that is threaded and open, and a second end that is closed ("blind").  Docket No. 274 at 3, ¶ 8.[3]  Using a "blind nipple" has the following advantages over end caps: (1) it reduces, if not eliminates, problems with creating sealed connections as it avoids creating a joint through which gas could leak and (2) it allows for the connection of the nipple to the threaded section without marring or scratching the surface of the nipple.  *Id.*, ¶ 9.

The '670 patent is a continuation of the same application as the '117 patent and purports to solve the same problems as the '117 patent.  *Id.* at 4, ¶ 17.  The '670 patent contains two independent claims, each of which also include the following limitation:

---

[3] Warming Trends denies this fact on the ground that the Firefly defendants' citation is only to one embodiment in the '117 patent and that the "patent discloses a variety of embodiments addressing the same or similar issues."  Docket No. 301 at 3, ¶ 8.  The Court deems this fact undisputed because Warming Trends does not dispute that the described nipple structure is one of the ways the '117 patent purports to solve the problems.  *See generally id.*

"the first end, second end, and side wall of the nipple are of integral, one piece, construction free of joints."  *Id*., ¶ 18.

By October 2019, the Firefly defendants began offering their new brass burners for sale.  Docket No. 276 at 9, ¶ 36.  The nipples on the Firefly burners do not use threads, but rather use press fit connections, meaning the nipple is pushed into the connecting piece using force.  Docket No. 274 at 6, ¶ 34.[4]  Press-fit technology has been used in the automotive and other industries for decades.  *Id*. at 6-7, ¶ 35.  Some of the Firefly defendants' burners used "blank end nipples" and other burners used "end caps."  *Id*. at 7, ¶ 36.[5]  Warming Trends would not permit Mr. Stone to view the '117 patent before it was issued.  *Id*., ¶ 42.  In January 2021, the Firefly defendants began selling the burners with the end caps and brazed connections to defendant AMD Direct.  *Id*. at 8, ¶ 47.  All of the accused burners are made of UNS C36000 brass.  *Id*., ¶ 49.  UNS C36000 brass is referred to as cutting brass and is commonly used in the plumbing and gas industries because it is cost-effective and suitable for cutting or

---

[4] Warming Trends denies this fact.  *See* Docket No. 301 at 6, ¶ 34.  However, the denial and cited evidence does not relate to whether the nipples use threads or press-fit connections to connect the nipple to the connecting piece.  *See generally id*.  As a result, the Court deems this fact undisputed.

[5] Warming Trends denies this fact.  *See* Docket No. 301 at 6-7, ¶ 36.  However, the denial and cited evidence does not relate to whether the burners used blank end nipples or end caps.  *See generally id*.  Warming Trends' other responses admit that the Firefly defendants at some point in time used burners with "blank end nipples" and burners with "end caps."  *See id*. at 8-9, ¶¶ 43, 46-47.  As a result, the Court deems this fact undisputed.

machining.  *Id.*, ¶ 52.[6]  The jets on the accused burners are threaded.  *Id.*, ¶ 54.

Twenty-seven threads per inch is a common thread density.  *Id.* at 9, ¶ 57.[7]

## II.    LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when

the "movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986).  A disputed fact is "material" if,

under the relevant substantive law, it is essential to proper disposition of the claim.

*Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001).  Only disputes

over material facts can create a genuine issue for trial and preclude summary judgment.

*Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005).  An issue is

"genuine" if the evidence is such that it might lead a reasonable jury to return a verdict

for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

Where "the moving party does not bear the ultimate burden of persuasion at trial,

it may satisfy its burden at the summary judgment stage by identifying a lack of

evidence for the nonmovant on an essential element of the nonmovant's claim."

*Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (quotations

omitted).  "Once the moving party meets this burden, the burden shifts to the nonmoving

---

[6] Warming Trends admits that UNS C36000 is "sometimes used" in the plumbing and gas industries.  *See* Docket No. 301 at 10, ¶ 52.  However, Warming Trends' citation to the expert report does not contradict the assertion that UNS C36000 brass is commonly used in these industries.  *See generally id.*  Therefore, the Court deems this fact undisputed.

[7] Warming Trends denies this fact.  *See* Docket No. 301 at 10, ¶ 57.  However, the cited evidence does not dispute that 27 threads per inch is a common thread density.  *See generally id.*  As a result, the Court deems this fact undisputed.

party to demonstrate a genuine issue for trial on a material matter." *Concrete Works of Colo., Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994). The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quotations omitted). "To avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case." *Bausman*, 252 F.3d at 1115. When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *Id.* Cross-motions for summary judgment must be viewed separately, and the denial of one does not necessitate the granting of the other. *United States v. Supreme Court of N.M.*, 839 F.3d 888, 906-07 (10th Cir. 2016) (citations omitted).

## III.   ANALYSIS

### A.  Firefly Defendants' Motion for Summary Judgment

The Firefly defendants move for summary judgment on all claims asserted against them including: 1) patent infringement; 2) misappropriation of trade secrets under federal and state law; 3) breach of contract (against Mr. Stone); 4) intentional interference; 5) false marking; 6) false advertising under the Lanham Act; 7) false advertising under the Colorado Consumer Protection Act; and 8) unfair competition. *See* Docket No. 274 at 10-25.

#### 1.  Patent Infringement

Warming Trends alleges that two distinct groups of the Firefly defendants' brass burners infringe the '117 patent and the '670 patent. Docket No. 301 at 15. The "Group

1 Products" include brass burners with "blank end nipples." *Id*. The "Group 2 Products" include brass burners with "press fit end" caps. *Id*.; Docket No. 301-3 at 30-31, ¶¶ 96-99.[8] The Firefly defendants move for summary judgment, arguing that the accused instrumentalities do not infringe either the '117 patent or the '670 patent literally or under the doctrine of equivalents. Docket No. 274 at 10.

### a. Literal Infringement

Determining whether direct patent infringement has occurred "requires a two-step analysis[:] First, the claim must be properly construed to determine its scope and meaning. Second, the claim as properly construed must be compared to the accused device or process." *Stumbo v. Eastman Outdoors, Inc.*, 508 F.3d 1358, 1361 (Fed. Cir. 2007) (citations omitted). The Court has already construed the parties' disputed claim terms. *See* Docket No. 333. As to the second step in the infringement analysis, a plaintiff will succeed if it can "show that the accused device contains every limitation in the asserted claims." *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 980 (Fed. Cir. 1999). "If even one limitation is missing or not met as claimed, there is no literal infringement." *Id*. (citation omitted). "Mere possession of a product which becomes covered by a subsequently issued patent does not constitute an infringement of that patent until the product is used, sold, or offered for sale in the United States during the term of the patent." *Welker Bearing Co. v. PHD, Inc.*, 550 F.3d 1090, 1095 (Fed. Cir. 2008).

---

[8] The Firefly defendants' motion referred to the Group 1 burners as the "Firefly Burners" and the Group 2 burners as the "AMD burners." *See* Docket No. 321 at 3 n.2. For clarity, the Court will use the labels of Group 1 burners and Group 2 burners to refer to the accused instrumentalities.

### i.   '117 Patent

The Firefly defendants argue that the Group 1 and Group 2 burners do not literally infringe the '117 patent.  Docket No. 274 at 10.  Claim 1 of the '117 patent requires that "the nipple has a first end that is threaded and a second end that is closed."  *Id*.  The Firefly defendants argue that it is undisputed that none of the accused instrumentalities has ever included a nipple with one end that is threaded.  *Id*. at 10-11.  Warming Trends does not dispute that the Group 1 and Group 2 burners do not literally infringe the '117 patent.  *See generally* Docket No. 301.  Accordingly, because there is no genuine issue of material fact that the Group 1 and Group 2 burners do not contain all the limitations found in Claim 1 of the '117 patent, the Firefly defendants are entitled to summary judgment on this claim.  *See Elkay*, 192 F.3d at 980.

### ii.   '670 Patent

Furthermore, the Firefly defendants argue that the Group 1 and Group 2 burners do not literally infringe the '670 patent.  Docket No. 274 at 11.  Like the '117 patent, the '670 patent contains the following limitation: "the first end, second end, and side wall of the nipple are of integral, one piece, construction free of joints."  *Id*. at 4, ¶ 18.  The Firefly defendants argue it is undisputed that the Group 2 burners use endcaps that are press-fit and welded onto the nipples.  *Id*. at 11.  Defendants argue that because the nipple and end cap are made of two pieces and form a joint where the end cap connects the nipple, the Group 2 burners do not satisfy the limitation of "integral, one piece, construction free of joints" and therefore do not literally infringe the '670 patent.  *Id*.  Warming Trends does not dispute that the Group 2 burners do not literally infringe the '670 patent.  *See generally* Docket No. 301.  Accordingly, because there is no

genuine issue of material fact that the Group 2 burners do not contain all the limitations found in the '670 patent, the Firefly defendants are entitled to summary judgment on this claim.  *See Elkay*, 192 F.3d at 980.

Regarding the Group 1 burners, the Firefly defendants argue that they stopped selling and offering to sell the burners before the publication of the '670 patent and destroyed all the Group 1 burners more than a year before the '670 patent was issued. Docket No. 274 at 11.  The '670 patent was issued on December 7, 2021.  *Id*. at 2-3, ¶ 5; *see also* Docket No. 274-3 at 2.  The Firefly defendants argue that the undisputed evidence shows that they did not make, use, sell, offer to sell, or place any new orders for burners with a blank end nipple after May 2020 and that Mr. Stone collected and destroyed the burners that used blank end nipples in August 2020.  Docket No. 274 at 7-8, ¶¶ 44, 46.  Therefore, the Firefly defendants argue that the Group 1 burners could not have infringed on the '670 patent literally or under the doctrine of equivalents because infringement requires conduct "during the term of the patent."  *Id*. at 12 (citing 35 U.S.C. § 271(a)).[9]

Warming Trends argues that there are genuine issues of material fact as to whether the Firefly defendants and AMD continued to sell the Group 1 burners after issuance of the '670 patent.  Docket No. 301 at 18.  Warming Trends contends that the evidence shows that the Firefly defendants shipped over 1,000 of the Group 1 burners to AMD.  *Id*.  However, none of plaintiff's cited evidence establishes that the Firefly defendants shipped any Group 1 burners to AMD after issuance of the '670 patent on

---

[9] The Firefly defendants' argument appears to concede that the Group 1 burners contain all the limitations of the '670 patent.  *See* Docket No. 274 at 11-12.

December 7, 2021.  *See* Docket No. 301-8 at 10-11, 308:2-310:22 (discussing purchase orders and shipments to AMD in 2020); Docket No. 301-19 at 2 (email from Mr. Stone on May 12, 2020 discussing inventory and purchase orders); Docket No. 301-21 at 2 (email from Mr. Stone on August 21, 2020 discussing the unusable blank end burners); Docket No. 301-20 at 6, 151:4-152:4 (discussing Mr. Stone's email from August 21, 2020); Docket No. 301-9 at 7, 134:1-21 (discussing burners shipped in March 2020); Docket No. 301-22 at 2 (email from Mr. Stone on March 10, 2020 discussing inventory and shipments); Docket No. 301-23 at 5, 35:10-36:14 (discussing burners that AMD received from Mr. Stone in 2020).  Warming Trends further argues that AMD offered blank end nipple burners for sale through at least one reseller's website as late as December 7, 2022.  Docket No. 301 at 18.  However, whether AMD offered any Group 1 burners for sale after issuance of the '670 patent has no bearing on whether the Firefly defendants infringed the '670 patent.  Warming Trends has provided no evidence that the Firefly defendants made, used, sold, or offered to sell any Group 1 burners after issuance of the '670 patent.  Accordingly, the Firefly defendants are entitled to summary judgment that they did not infringe the '670 patent literally or under the doctrine of equivalents with the Group 1 burners.  *See Welker Bearing*, 550 F.3d at 1095.

As a result, the Court grants the portion of the motion requesting summary judgment that the Group 1 and Group 2 burners do not literally infringe the '117 patent or the '670 patent.  The Court also finds that the Group 1 burners do not infringe the '670 patent under the doctrine of equivalents because infringement requires conduct during the term of the patent.

### b. Doctrine of Equivalents

"Even without literal infringement of a certain claim limitation, a patentee may establish infringement under the doctrine of equivalents if an element of the accused device 'performs substantially the same function in substantially the same way to obtain the same result as the claim limitation.'" *EMD Millipore Corp. v. AllPure Tech., Inc.*, 768 F.3d 1196, 1202 (Fed. Cir. 2014) (citation omitted). "The doctrine of equivalents prevents an accused infringer from avoiding infringement by changing only minor or insubstantial details of a claimed invention while retaining their essential functionality." *Sage Prods., Inc. v. Devon Indus.*, 126 F.3d 1420, 1424 (Fed. Cir. 1997). The Firefly defendants argue that prosecution history estoppel and claim vitiation bar Warming Trends from asserting infringement under the doctrine of equivalents ("DOE"). Docket No. 274 at 12-16.

### i. Prosecution History Estoppel

Prosecution history estoppel "limits the doctrine of equivalents when an applicant makes a narrowing amendment for purposes of patentability, or clearly and unmistakably surrenders subject matter by arguments made to an examiner." *AquaTex Industries, Inc. v. Techniche Solutions*, 419 F.3d 1374, 1382 (Fed. Cir. 2005). The patentee has the burden of rebutting the application of prosecution history estoppel by establishing one of three exceptions: "(1) the equivalent was unforeseeable at the time of the application; (2) the rationale underlying the amendment bears no more than a tangential relation to the equivalent in question; or (3) there is some other reason suggesting that the patentee could not reasonably be expected to have described the equivalent." *EMD Millipore*, 768 F.3d at 1203. Whether prosecution history estoppel

applies is a question of law.  *Id*. at 1201.  If prosecution history estoppel applies, it is "unnecessary for the district court to perform a doctrine of the equivalents analysis."  *Id*. at 1203.

The Firefly defendants argue that prosecution history estoppel bars Warming Trends from claiming that the Group 2 burners infringe either patent.  Docket No. 274 at 13-14.  The Firefly defendants argue that plaintiff narrowed the scope of the '117 patent twice to overcome prior art rejections.  *Id*. at 13.  They assert that Warming Trends expressly disclaimed from the scope of its patent a burner that uses a welded end cap, and therefore is barred by prosecution history estoppel from recapturing this surrendered scope.  *Id*. at 13-14.  Warming Trends responds that the Firefly defendants have not explained how the subject matter allegedly surrendered includes the "press fitted" burners.  Docket No. 301 at 18-19.  Warming Trends states that the amendment was prompted by the examiner's citation to a manual discussing "welding caps," which did not disclose or mention "press fitted ends."  *Id*. at 19.  Warming Trends therefore asserts that the "rationale behind the amendment has, at most, a tangential relationship to the equivalent in question."  *Id*.

The following facts are undisputed.  Claim 1 of the '117 patent application initially stated that "the first end, second end, and side wall of the nipple are one piece."  Docket No. 274 at 4, ¶ 12.  To overcome an initial rejection on the grounds of obviousness in view of prior art, Warming Trends added the underlined language: "the first end, second end, and side wall of the nipple are of integral, one piece, construction."  *Id*., ¶ 13.  In response to another rejection, Warming Trends added the underlined language: "the first end, second end, and side wall of the nipple are of integral, one piece, construction

free of joints." *Id*., ¶ 15.  In its interview with the United States Patent and Trademark Office, Warming Trends conceded that a burner with a welded end cap includes a joint. *Id*., ¶ 16.

Warming Trends twice made amendments seeking to narrow the scope of its claim for purposes of patentability,[10] and therefore there is a presumption that prosecution history estoppel applies.  *EMD Millipore*, 768 F.3d at 1203.  The Court finds that Warming Trends has not rebutted the presumption through one of the three exceptions.  Warming Trends asserts that the second exception applies, but fails to explain how the amendments are only tangentially related to the Group 2 burners with press fit end caps.  Warming Trends conceded that a burner with a *welded end cap* is outside the scope of the amendment "free of joints" because a burner with a welded end cap includes a joint.  *See* Docket No. 274 at 4, ¶¶ 15-16.  Warming Trends provides no argument distinguishing welded end caps from press fit end caps.  *See generally* Docket No. 301.  As a result, Warming Trends has failed to meet its burden of demonstrating that the rationale underlying the amendment has a tangential relationship to the Group 2 burners.  Accordingly, the Court finds that prosecution history estoppel bars Warming Trends from asserting an infringement claim under the doctrine of equivalents for the Group 2 burners.

---

[10] To the extent that the rationale for the amendments is ambiguous, the Supreme Court has held that, "[w]here no explanation is established[,] the court should presume that the patent applicant had a substantial reason related to patentability for including the limiting element added by amendment."  *Warner-Jenkinson Co., Inc. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 33 (1997).

### ii.    Claim Vitiation

The Firefly defendants also assert that plaintiff's DOE arguments for all of the accused burners fail because these arguments would vitiate express claim limitations. Docket No. 274 at 14; Docket No. 321 at 5.  The Court previously held that prosecution history estoppel bars any DOE arguments for the Group 2 burners.  Accordingly, the Court will not reach defendants' arguments about claim vitiation for the Group 2 burners.  Additionally, regarding the Group 1 burners, the Court held that the Firefly defendants did not infringe the '670 patent under the doctrine of equivalents because infringement requires conduct during the term of the patent.  Therefore, the only remaining issue is whether the Group 1 burners infringe the '117 patent under the doctrine of equivalents.

"Under the doctrine of equivalents, an infringement theory. . . fails if it renders a claim limitation inconsequential or ineffective."  *Edgewell Personal Care Brands, LLC v. Munchkin, Inc*., 998 F.3d 917, 923 (Fed. Cir. 2021) (citation omitted).  The claim vitiation doctrine ensures that the doctrine of the equivalents does not "effectively eliminate [a claim] element in its entirety."  *Id*. (quoting *Warner-Jenkinson Co*., 520 U.S. at 29). Claim vitiation is a legal determination that no reasonable jury could determine two elements to be equivalent.  *Id*.  Claim vitiation is most clearly applicable when the accused product has the "antithesis" of the claimed structure; however, courts "should be cautious not to shortcut this inquiry by identifying a 'binary' choice in which an element is either present or not present."  *Id*. at 924 (internal quotations and citations omitted).

The Firefly defendants argue that plaintiff's DOE arguments regarding the Group 1 burners would vitiate express claim limitations in the '117 patent.  Docket No. 274 at 15.  Claim 1 of the '117 patent requires that "the *nipple has a first end that is threaded and a second end that is closed*."  *Id*. at 3, ¶ 11 (emphasis added).  The nipples of the Group 1 burners use a press-fit connection, not threads.  *Id*. at 6, ¶ 34.  The Firefly defendants argue that no reasonable jury could conclude that "a nipple with an open end that is threaded is equivalent to a nipple with an open end that is not threaded."  *Id*. at 15.  They argue that the limitation relates directly to a problem that the patent attempts to solve: the difficulties of creating gas-tight connections with two threaded ends.  *Id*.  The Firefly defendants also argue that press-fit connections are not new technology and therefore it was foreseeable that someone might use a non-threaded connection at the time plaintiff submitted the patent application.  *Id*.

Warming Trends argues that claim vitiation does not bar its DOE arguments because the expert testimony creates a question of fact precluding summary judgment. Docket No. 301 at 20 (citing *Munchkin,* 998 F.3d at 923-25).  Warming Trends states that Dr. Harri Kytomaa's expert report establishes that the press fittings on the Group 1 burners perform substantially the same function, in substantially the same way, to achieve substantially the same result as the limitation.  *Id*. [11]

The Court finds that Warming Trends' theory of infringement under the doctrine of equivalents does not vitiate the limitation in Claim 1 of the '117 patent requiring a

---

[11] In reply, the Firefly defendants assert that the Court should not accept Dr. Kytomaa's conclusions because they are unsupported, broad, conclusory statements.  Docket No. 321 at 4.  The Court disagrees and finds that Dr. Kytomaa has supported the disputed conclusions with sufficient facts.

threaded end.  A reasonable juror could find that a press fit connection performs substantially the same function, in substantially the same way, achieving the same result, as the threaded connection.  *See Munchkin,* 998 F.3d at 924.   Dr. Kytomaa's report explains that the press fit ends in the Group 1 products perform substantially the same function as the threaded ends in the '117 patent by "connecting a nipple to a connector to allow gas to flow from the connector into the nipple."  Docket No. 301-3 at 41, ¶¶ 127-28.  The report explains that the Group 1 products perform the function in substantially the same way because "both the threaded and the press fit first ends have a diameter that is smaller than the main body of the nipple. . . so that the first end can fit inside a female port in a connector to attach the nipple to the connector."  *Id*. at 41-43, ¶¶ 129-132.  The report explains that the press fit end achieves the same result as a threaded end because "both result in attachment of the nipple to a connector such that gas flows from the internal open channel of the connector into the nipple."  *Id*. at 43, ¶¶ 133-34.  Dr. Kytomaa's analysis is also supported by Mr. Stone's deposition testimony where he confirmed that both press fit and threaded ends achieve the same result of creating a secure fitting that does not leak gas.  *Id*., ¶ 134.

The Court finds that a reasonable jury could find the press fit connection and the threaded connection to be equivalent.  As a result, claim vitiation does not bar Warming Trends from asserting that the Group 1 products infringe the '117 patent under the doctrine of the equivalents.  *See Munchkin,* 998 F.3d at 925 (reversing the district court's grant of summary judgment on the basis of claim vitiation where the expert's "detailed application of the function-way-result test, supported by deposition testimony from [the] employees, [was] sufficient to create a genuine issue of material fact for the

jury to resolve").  Accordingly, the Court denies this portion of the summary judgment motion.

In sum, the Court grants summary judgment in favor of the Firefly defendants that the Group 2 burners do not literally infringe the '117 patent or the '670 patent, and that prosecution history estoppel bars Warming Trends from asserting a DOE theory for the Group 2 burners.  The Court also grants summary judgment in favor of the Firefly defendants that the Group 1 burners do not literally infringe the '117 patent and do not infringe the '670 patent literally or under the doctrine of equivalents.  Warming Trends is allowed to proceed against the Firefly defendants on the theory that the Group 1 burners infringe the '117 patent under the doctrine of the equivalents.

### 2.  Trade Secrets Claims

The Firefly defendants move for summary judgment on Warming Trends' claims for misappropriation of trade secrets under Colorado law and the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836.  Docket No. 274 at 17.  To establish a misappropriation of trade secrets claim under either federal or state law, the plaintiff must prove: 1) the existence of a trade secret; 2) the acquisition, use, or disclosure of the trade secret without consent; and 3) the person acquiring, using, or disclosing the trade secret knew or had reason to know that the trade secret was acquired by improper means.  *See Zvelo, Inc. v. Akamai Techs., Inc.*, No. 19-cv-00097-PAB-SKC, 2019 WL 4751809, at *2 (D. Colo. Sept. 30, 2019).[12]

---

[12] Under the DTSA, the trade secret must also "relate[] to a product or service used in, or intended for use in, interstate or foreign commerce."  18 U.S.C. § 1836(b)(1).

Under Colorado law, "[w]hat constitutes a 'trade secret' is a question of fact for the trial court." *Doubleclick Inc. v. Paikin*, 402 F. Supp. 2d 1251, 1257 (D. Colo. 2005) (citation omitted).  Courts look to several factors to make this determination, including:

> (1) the extent to which the information is known outside the business, (2) the extent to which it is known to those inside the business, i.e., by the employees[,] (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information, (4) the savings effected and the value to the holder in having the information as against competitors, (5) the amount of effort or money expended in obtaining and developing the information, and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*Id*. (internal quotation marks omitted).  A trade secret cannot be "public knowledge" or commonly known in a trade.  *Hawg Tools, LLC v. Newsco Int'l Energy Servs., Inc.*, 411 P.3d 1126, 1130 (Colo. App. 2016).  The DTSA defines "trade secret" to include "all forms and types of financial, business, scientific, technical, economic, or engineering information" so long as "the owner thereof has taken reasonable measures to keep such information secret" and "the information derives independent economic value, actual or potential, from not being generally known to," or ascertainable by, another person.  18 U.S.C. § 1839(3).  Due to the similarities in the elements, the Court will address the federal and state claims together.

Warming Trends argues that the Firefly defendants have misappropriated three trade secrets regarding the Warming Trends burners: the thread pattern, the type of brass (UNS C36000), and the design of the burners.  Docket No. 301 at 20.  The Firefly defendants argue that the thread pattern, the type of brass, and the design do not qualify as trade secrets, and even if they did, there is no evidence that defendants misappropriated this information.  Docket No. 274 at 17.  The Court first addresses whether the design process, type of brass, and thread pattern constitute trade secrets.

First, the Firefly defendants argue that plaintiff's allegations related to the "design process" are too vague to be actionable. *Id*. at 19. In its response, Warming Trends does not address this argument or assert any facts related to the alleged design process trade secret. *See generally* Docket No. 301. The Court accordingly will grant summary judgment on the design process allegation because Warming Trends has not adequately identified the information it believes was protected or presented evidence showing that the information was secret. *See SGS Acquisition Co. Ltd. v. Linsley*, 352 F. Supp. 3d 1109, 1123 (D. Colo. 2018) (granting summary judgment where plaintiff failed to describe the alleged trade secret with specificity).

Second, the Firefly defendants argue that UNS C36000 brass is not a trade secret because this type of brass is commonly used in the industry. Docket No. 274 at 18-19. Warming Trends alleges that UNS C36000 brass is not commonly used, but its citation to Dr. Kytomaa's report does not support this assertion. *See* Docket No. 301 at 21; Docket No. 301-3 at 139-41, ¶¶ 444-48. It is undisputed that UNS C36000 brass is commonly used in the plumbing and gas industries because it is cost-effective and suitable for cutting or machining. Docket No. 274 at 8, ¶ 52. As a result, the type of brass cannot constitute a trade secret because UNS C36000 brass is commonly known in the trade. *See Hawg Tools*, 411 P.3d at 1130; 18 U.S.C. § 1839(3). The Court will therefore grant summary judgment on the type of brass allegation.

Finally, the Firefly defendants argue that the specific threading pattern is not a trade secret because 27 threads per inch is a common thread density and is observable. Docket No. 274 at 18. Warming Trends argues that the specific threading is a trade secret because "[e]vidence on the record exists to show that the specific

threading . . . [was] kept secret by Warming Trends and provided a competitive advantage in the industry."  Docket No. 301 at 21.  Warming Trends, however, fails to cite any evidence in support of this assertion.  Warming Trends further argues that the Firefly defendants cite no evidence that the thread pattern is observable and that the only evidence regarding the observability of the thread pattern is Dr. Kytomaa's report, which explains that the thread pattern is not standard.  *Id*.  The cited evidence, even construed most favorably to plaintiff, is not sufficient to establish a trade secret. Warming Trends fails to describe what measures, if any, it has taken to keep the thread pattern information secret.  *See Paikin*, 402 F. Supp. 2d at 1257; 18 U.S.C. § 1839(3). Warming Trends has also failed to cite any evidence showing that the thread pattern is not easily ascertainable.  The only evidence plaintiff cites, Dr. Kytomaa's report, demonstrates that the thread pattern can be measured.  *See* Docket No. 301-3 at 141, ¶ 449.  The Court finds that summary judgment is warranted on this allegation because Warming Trends has failed to bring forth specific facts showing that there is a genuine issue for trial regarding whether the thread pattern is a trade secret.

Accordingly, the Court will grant the Firefly defendants' motion for summary judgment on the federal and state law claims for misappropriation of trade secrets.

### 3.  *Breach of Contract Claim against Mr. Stone*

The Firefly defendants move for summary judgment on the breach of contract claim asserted against Mr. Stone.  Docket No. 274 at 19-21.  To prevail on a breach of contract claim under Colorado law, a plaintiff must establish: (1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) damages to the plaintiff.

*Mahajan v. Boxcar Holdings, LLC*, No. 18-cv-00533-CMA-SKC, 2019 WL 399230, at *4

n.1 (D. Colo. Jan. 31, 2019) (citing *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058

(Colo. 1992) (collecting cases)).  Colorado public policy strongly disfavors non-compete

agreements.  *See DBA Enterprises, Inc. v. Findlay*, 923 P.2d 298, 302 (Colo. App.

1996); *Crocker v. Greater Colo. Anesthesia, P.C.*, 463 P.3d 860, 866 (Colo. App. 2018).

Interpretation of a contract is a question of law.  *See DTC Energy Grp., Inc. v.

Hirschfeld*, 912 F.3d 1263, 1273 (10th Cir. 2018).  Under Colorado law, the primary goal

of contract interpretation is to determine and give effect to the intention of the parties.

*See Cache Nat'l Bank v. Lusher*, 882 P.2d 952, 957 (Colo. 1994); *Pepcol Mfg. Co. v.

Denver Union Corp.*, 687 P.2d 1310, 1314 (Colo. 1984) (recognizing contract must be

construed to ascertain and effectuate mutual intent of the parties).  The intent of the

parties to a contract is to be determined primarily from the language of the instrument

itself.  *See KN Energy, Inc. v. Great W. Sugar Co.*, 698 P.2d 769, 776 (Colo. 1985).  "It

is axiomatic that [courts] . . . must enforce an unambiguous contract in accordance with

the plain and ordinary meaning of its terms."  *USI Props. East, Inc. v. Simpson*, 938

P.2d 168, 173 (Colo. 1997).  "In ascertaining whether certain provisions of an

agreement are ambiguous, the instrument's language must be examined and construed

in harmony with the plain and generally accepted meaning of the words employed."  *Id*.

A difference of opinion regarding the interpretation of a contract does not create an

ambiguity in the contract.  *In re May*, 756 P.2d 362, 369 (Colo. 1988).

The non-compete provision of the 2015 Agreement states that Mr. Stone "shall

not, either directly or indirectly, separately or in association with others . . . (c) work for,

engage or invest in, directly or indirectly, in a business competitive with Rock

Enterprises, Inc."  Docket No. 274-10 at 2.  The 2017 Agreement states that all of the

obligations set forth in the 2015 Agreement

> remain in full force and effect with the following specific exceptions: a) the Non-Solicitation/Non-Compete portion of the agreement shall expire January 11, 2019; b) Ray Stone and Firefly may continue to install firepits but they shall not fabricate or manufacture; and c) Ray Stone and Firefly may market the portable firepit product and m[a]y procure elements of that product from any source so long as no part of the portable firepit replicates Rock Enterprises, Inc. burners.

Docket No. 274-11 at 2.  The 2018 Agreement between Mr. Stone and Warming Trends

states that all provisions in the 2015 and 2017 Agreements remain in full force and

effect and extended the non-compete provision of the agreements to April 2, 2019.

Docket No. 274-12 at 2.

Warming Trends alleges that Mr. Stone breached his non-compete agreement on

numerous occasions.  Docket No. 301 at 11-14.  In particular, Warming Trends argues

that Mr. Stone breached the non-compete agreement before April 2, 2019 by a)

competing against Warming Trends with brass burners; b) manufacturing and selling

steel log sets; and c) disclosing the existence of his non-compete agreement.  *Id*. at 12-

13.  The Firefly defendants argue that none of these allegations constitute a breach of

the non-compete agreement.  Docket No. 274 at 19-21; Docket No. 321 at 7-8.

### a.  Brass Burners

Warming Trends alleges that Mr. Stone breached the non-compete agreement

by soliciting price quotes from manufacturers of brass parts, commissioning drawings of

brass burners, sending drawings of burners to manufacturers, and soliciting business

partners and investments for a brass burner business competitive with Warming Trends.

Docket No. 301 at 12-13.  The Firefly defendants do not dispute that Mr. Stone engaged

in these activities.  *See* Docket No. 274 at 20; Docket No. 321 at 3.  However, the

24

Firefly defendants argue that Mr. Stone did not breach the non-compete agreement because these activities constitute mere preparations to compete and the non-compete agreement did not prohibit Mr. Stone from preparing to compete.  Docket No. 274 at 20. The Firefly defendants cite several cases in support of their argument that competing is distinguishable from "preparing to compete."  *Id*. at 20-21 (citing *Hibu, Inc. v. Peck*, 2017 WL 5483440, at *5-6 (D. Kan. Nov. 15, 2017) (holding that actions in preparation to compete in the future did not violate non-compete agreement); *Jet Courier Serv., Inc. v. Mulei*, 771 P.2d 486, 492-94 (Colo. 1989) (holding that, in the context of the duty of loyalty, an employee has a privilege to make "preparations to compete after the termination of his employment").[13]  Warming Trends asserts that Mr. Stone himself admitted that he understood he was "not supposed to do anything with" brass burners under the terms of his non-compete agreement.  Docket No. 301 at 12; Docket No. 301-27 at 4, 21:17-22:18.[14]

---

[13] Warming Trends asserts that the Firefly defendants misstate the holdings of *Hibu* and *Jet Courier*.  Docket No. 301 at 13-14.  Warming Trends claims that the court in *Hibu* did not address whether a noncompete could extend to preparations to compete, but rather the court simply held that the noncompete had not been breached because the defendant made preparations to compete in an area that was not covered by the noncompete agreement.  *Id*. at 14.  This interpretation of *Hibu* is incorrect.  The court in *Hibu* expressly found that the noncompete prohibited the defendant from competing in the territory of Wichita, Kansas; however, the court held that defendant's preparations to compete and expand into Wichita did not breach the agreement.  *Hibu*, 2017 WL 5483440, at *5-6.  Warming Trends also claims that *Jet Courier* stands for the proposition that acts made in anticipation of future competition are actionable.  Docket No. 301 at 14.  The court in *Jet Courier,* however, expressly held that an employee has the legal right to make preparations to compete without violating her duty of loyalty.  *Jet Courier*, 771 P.2d at 494.

[14] The Court will not consider Mr. Stone's deposition testimony stating that he understood he was "not supposed to do anything with" brass burners under the terms of his non-compete agreement.  *See* Docket No. 301-27 at 4, 21:17-22:18; *see also KN Energy, Inc.*, 698 P.2d at 776 (discussing how the court can only look beyond the

The Court finds that the activities of Mr. Stone that plaintiff identifies do not violate the 2018 Agreement. The language of the non-compete agreement is unambiguous. The non-compete provision states that Mr. Stone shall not "work for, engage or invest in, directly or indirectly, in a business competitive with Rock." Docket No. 274-10 at 2; Docket No. 274-12 at 2. The subject of the sentence is a "business competitive with Rock." *See* Docket No. 274-10 at 2. Warming Trends does not show that Mr. Stone acquired pricing information or burner drawings from any of Warming Trends' competitors or that Mr. Stone sent burner components to any competitor. *See generally id.* Moreover, that Mr. Stone solicited partners and funding does not violate the non-compete agreement because that activity has not been shown to involve work for, engagement with, or investment in a Warming Trends competitor.

Warming Trends cites *Nat'l Propane Corp. v. Miller,* 18 P.3d 782, 788 (Colo. App. 2000), and argues that the Colorado court in that case held that a similar non-compete agreement was breached when the defendant engaged in the activities of pricing and ordering equipment. Docket No. 301 at 13. The *Miller* case does not support Warming Trends' argument. *See id.* The court in *Miller* did not hold that the activities of pricing or ordering equipment violated the non-compete agreement. *See Miller*, 18 P.3d at 788. Rather, the appellate court remanded the issue to the trial court for further consideration because the trial court considered irrelevant factors. *Id.*

Given Colorado's strong public policy disfavoring non-compete agreements and the unambiguous language of Mr. Stone's 2015 Agreement, the Court holds that Mr.

---

contract to determine the intent of the parties if the terms of the contract are ambiguous).

Stone's activities of acquiring pricing information from potential manufacturers, creating and sending drawings of burners to brass manufacturers, and soliciting future business partners and investments, none of whom were competitors of Warming Trends, do not violate the non-compete agreement.  *See Findlay*, 923 P.2d at 302.

### b.  Steel Logs and Disclosure of the Existence of the Non-compete Agreement

In sections III(B)(1)(b) and III(B)(1)(c) of this Order, the Court grants Warming Trends' motion for summary judgment that Mr. Stone breached the non-compete agreement by manufacturing steel logs and by disclosing the existence of his non-compete agreement.

Accordingly, the Court will grant in part and deny in part the portion of the Firefly defendants' motion requesting summary judgment on the breach of contract claim against Mr. Stone.  The Court grants summary judgment in Mr. Stone's favor that his activities of acquiring pricing information from potential manufacturers, creating and sending drawings of burners, and soliciting future business partners and investments do not violate the non-compete agreement.  The Court denies Mr. Stone's request for summary judgment on the steel logs allegation and the disclosure allegation.

### 4.  *Intentional Interference Claim*

Warming Trends also alleges that the Firefly defendants intentionally induced Mr. Stone to breach his contract.  *See* Docket No. 217 at 19-20.  To succeed on a claim for intentional interference with contractual relations, a plaintiff must show that the defendant intentionally and improperly caused a third-party to breach a contract with the plaintiff.  *See Integrity Med. Mgmt., LLC v. Surgical Ctr. at Premier, LLC*, 234 F. Supp. 3d 1085, 1098 (D. Colo. 2017) (citing *Warne v. Hall*, 373 P.3d 588, 595 (Colo. 2016)).

The Firefly defendants only argue that plaintiff's intentional interference claim must be dismissed because Mr. Stone did not breach the contract.  Docket No. 274 at 21. Because the Court finds that Mr. Stone breached the non-compete agreement, the Court accordingly denies summary judgment on the intentional interference claim against the Firefly defendants.

### 5.  False Marking

Warming Trends alleges that the Firefly defendants falsely marked their burners as patented at the HNA Expo and on their website when the burners were not patented. Docket No. 301 at 22.  To prevail on a false marking claim under 35 U.S.C. § 292, a plaintiff must prove that: 1) defendants marked an unpatented article; 2) defendants intended to deceive the public; and 3) plaintiff suffered a "competitive injury."  *Two Moms & a Toy, LLC v. Int'l Playthings*, *LLC*, 898 F. Supp. 2d 1213, 1216 (D. Colo. 2012).  The competitive injury element is a standing requirement.  *Sukumar v. Nautilus, Inc.*, 785 F.3d 1396, 1400 (Fed. Cir. 2015).  A "competitive injury" is defined as a "wrongful economic loss caused by a commercial rival, such as the loss of sales due to unfair competition; a disadvantage in a plaintiff's ability to compete with a defendant, caused by the defendant's unfair competition."  *Gravelle v. Kaba Ilco Corp*., 684 F. App'x 974, 978 (Fed. Cir. 2017) (unpublished) (quoting *Sukumar*, 785 F.3d at 1400).

The parties do not dispute that the first element is satisfied.  It is undisputed that the Firefly defendants advertised their burners as "patented" at the HNA Expo in October 2019 and on their website when the burners were not patented.  Docket No. 276 at 8-9, ¶¶ 28, 30-31, 39; Docket No. 274 at 7, ¶ 38; Docket No. 301 at 7, ¶ 38;

Docket No. 321 at 2, ¶ 38.  The Court will therefore focus on the competitive injury and intent to deceive elements.

The Firefly defendants argue they are entitled to summary judgment because there is no evidence of competitive injury or deceptive intent.  Docket No. 274 at 22. The Firefly defendants argue that Warming Trends cannot prove competitive injury because Warming Trends has no evidence that it lost any sales due to the mismarking. *Id*.  The Firefly defendants assert there was no intent to deceive because the mismarking was simply a mistake and they took prompt remedial action upon learning of the mistake, including changing the language of their materials and website to clarify that the patent was "pending."  *Id*.

Warming Trends asserts that it suffered a competitive injury due to the mismarking, including "competitive disadvantage and lost sales."  Docket No. 301 at 23. Warming Trends cites the deposition testimony of its members, Tim Flaherty and Voni Flaherty, to support its assertion of lost sales.  *Id*. (citing Docket No. 301-13 at 4, 195:21-196:14; Docket No. 301-14 at 4, 214:10-216:10; Docket No. 301-15 at 4-5, 130:12-131:18, 132:1-133:5).  Warming Trends also advances two arguments in support of the intent to deceive element: 1) defendants did not take prompt remedial action because they kept the word "patented" on their website for an additional two months; and 2) Mr. Stone's knowledge that the marking was false creates a rebuttable presumption of intent to deceive the public.  *Id*.

The Court finds that Warming Trends has failed to establish a competitive injury and therefore Warming Trends lacks statutory standing.  When questioned whether plaintiff lost any sales due to the mismarking, Mr. Flaherty stated, "If the person buying

from [Mr. Stone] would have bought from us, I would say yes. . . . we lost sales."

Docket No. 301-14 at 4, 214:10-215:3.  However, Mr. Flaherty could not identify what

sales were made by the Firefly defendants at the HNA Expo or whether Warming

Trends lost any specific sales.  *Id.*, 215:18-216:22.  Mr. Flaherty stated that

> the fact that there was a competitive burner that appeared to be like ours, that *may have caused confusion*, that may have caused people to hesitate, could have an impact.  Also, I think the quality of the burner, or the lack of quality, *could dilute the impression* in the market of the brass burner.  And so, yes, we *could have lost sales.*

*Id.*, 216:4-10 (emphasis added).  Mr. Flaherty's testimony is too speculative to

demonstrate that Warming Trends lost sales due to the mismarking.  *See Gravelle*, 684

F. App'x at 979-80 (upholding district court's grant of summary judgment because

plaintiff's assertion that the false marking "could" have influenced a buyer's decision and

therefore decreased his sales was "too speculative" to create a triable issue).  Similarly,

Ms. Flaherty's testimony on the competitive injury is too speculative.  Ms. Flaherty

stated, "I believe that we have lost sales as a result of [the mismarking].  I believe that

has affected our reputation in the industry because people have confused our burners

with theirs, which is a lesser-quality burner."  Docket No. 301-15 at 4, 132:9-13.

However, Ms. Flaherty could not identify any specific sales that Warming Trends lost.

*Id.*, 132:17-21.  Warming Trends presents no other evidence regarding competitive

injury aside from the deposition testimony of Mr. Flaherty and Ms. Flaherty.  *See*

*generally* Docket No. 301.[15]  Because Warming Trends has failed to present any non-

---

[15] For example, Warming Trends has not presented any evidence that it was deterred from introducing or continuing to market a product similar to defendants' falsely marked product, from engaging in innovation in the field, or that it incurred costs in designing around the features marked as patented.  *See Forest Group, Inc. v. Bon Tool Co.*, 590

speculative evidence of competitive injury, the Court therefore finds that Warming Trends lacks statutory standing to assert a false marking claim.  *See Gravelle*, 684 F. App'x at 980.  As a result, the Court grants the Firefly defendants' motion for summary judgment on the § 292 claim.

### 6.  *Lanham Act Claim*

Warming Trends alleges that the Firefly defendants violated the Lanham Act by disseminating false information at the HNA Expo and on its website regarding the patent status of the burners.  *See* Docket No. 301 at 25.  The Lanham Act prohibits a person from using, in commercial advertising or promotion, any "false or misleading description of fact" that "misrepresents the nature, characteristics, qualities, or geographic origin" of another person's services or commercial activities.  15 U.S.C. § 1125(a)(1)(B); *Wilson v. AdvisorLaw LLC*, No. 17-cv-1525-MSK, 2018 WL 4932088, at *3 (D. Colo. Oct. 11, 2018).  To constitute "commercial advertising or promotion" under the Lanham Act, a factual representation must be: 1) commercial speech; 2) made by (or on behalf of) a defendant who is in commercial competition with the plaintiff; 3) for the purposes of influencing consumers to buy defendant's goods or services; and 4) disseminated sufficiently to the relevant purchasing public to constitute advertising or promotion within that industry.  *Id*. at *3 (citing *Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1273-74 (10th Cir. 2000)).  Tenth Circuit precedent makes it clear that "to constitute an actionable advertising or promotional campaign, a dissemination of information must reach some numerically-significant quantity of actual or potential customers of the

---

F.3d 1295, 1302-03 (Fed. Cir. 2009) (describing other ways that false marking may harm competition); *see also Gravelle*, 684 F. App'x at 979.

parties' products." *General Steel Domestic Sales, LLC v. Chumley*, 129 F. Supp. 3d 1158, 1175 (D. Colo. 2015) (citing *Sports Unlimited, Inc. v. Lankford Enterprises, Inc*., 275 F.3d 996, 1003-04 (10th Cir. 2002)); *see also Wilson*, 2018 WL 4932088, at *3.

The Firefly defendants argue that Warming Trends relies on speculation to satisfy the commercial dissemination prong and that Warming Trends has no evidence that a "significant" number of actual or potential customers saw the false statements. Docket No. 274 at 24. Warming Trends responds that "[s]everal courts have asserted that 'dissemination of false information to retailers at a trade show' satisfies the commercial dissemination element of a Lanham Act False Advertising claim." Docket No. 301 at 25 (citing *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1385 (5th Cir. 1996); *Semco, Inc. v. Amcast, Inc*., 52 F.3d 108, 114 (6th Cir. 1995); *Gordon & Breach Sci. Publishers. S.A. v. Am. Inst. of Physics,* 859 F. Supp. 1521, 1536 (S.D.N.Y. 1994); *National Artists Management Co. v. Weaving*, 769 F. Supp. 1224, 1233 (S.D.N.Y. 1994)). Warming Trends further argues that the misleading statement on the Firefly defendants' website satisfies the dissemination element of false advertising. *Id*.

The Court finds that Warming Trends has failed to put forth any evidence to show that the statements reached a "sufficient number of customers." *See Chumley*, 129 F. Supp. 3d at 1175 (granting summary judgment where the record was "vague" as to the number of customers who encountered the alleged false statements on a website). Warming Trends fails to provide any evidence regarding how many people encountered the false statements at the HNA Expo or on the website. *See generally* Docket No. 301. For example, Warming Trends offers no evidence of the number of attendees at the tradeshow. Warming Trends provides no evidence of the volume of traffic on

defendants' website, or that any potential customer saw the specific pages on the website that mentioned a "patented" burner.  *See Wilson*, 2018 WL 4932088, at *4 (granting summary judgment on Lanham Act claim where plaintiff failed to provide any evidence that potential customers actually saw the false statement on the "heavily-trafficked" website).

The Court finds plaintiff's cited cases distinguishable.  Whether commercial dissemination is sufficient depends on the particular industry.  *Wilson*, 2018 WL 4932088, at *3; *Sports Unlimited,* 275 F.3d at 1005.  In *Semco*, the Sixth Circuit found that the manufacturer of plunger tips stated a claim for false advertising due to defendant's use of a false promotional brochure at a tradeshow.  *Semco*, 52 F.3d at 114.  Warming Trends fails to explain how the plunger industry is similar to the brass burner industry or whether these industries have similar customer bases; therefore, the Court finds *Semco* distinguishable.  In the other cases, the courts merely noted in *dicta* that public dissemination of false information at a tradeshow could constitute commercial advertising.  *Coca-Cola*, 86 F.3d at 1385; *Gordon & Breach*, 859 F. Supp. at 1535.  These cases are therefore insufficient to satisfy plaintiff's burden of designating specific facts to show that the Firefly defendants' false statements reached a sufficient number of customers at the tradeshow.  Because Warming Trends has failed to establish an inference that the statements were "advertising," an essential element of the Lanham Act claim, the Firefly defendants are entitled to summary judgment on this claim.

### 7.  Colorado Consumer Protection Act Claim

Warming Trends alleges that the Firefly defendants also violated the Colorado Consumer Protection Act ("CCPA") by knowingly misrepresenting the patent status of their products directly to consumers at the HNA Expo, through direct emails to vendors, and on the company website.  Docket No. 301 at 24.  To prevail on a CCPA claim, a plaintiff must prove the following elements: "(1) that the defendant engaged in an unfair or deceptive trade practice; (2) that the challenged practice occurred in the course of defendant's business, vocation, or occupation; (3) that it significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property; (4) that the plaintiff suffered injury in fact to a legally protected interest; and (5) that the challenged practice caused the plaintiff's injury."  *Two Moms*, 898 F. Supp. 2d at 1219 (quoting *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining*, *Inc*., 62 P.3d 142, 146-47 (Colo. 2003)); *see also Renfro v. Champion Petfoods USA, Inc*., 25 F.4th 1293, 1301 (10th Cir. 2022).  In analyzing the third element, a significant public impact, Colorado courts consider three factors: (1) "the number of consumers directly affected by the challenged practice," (2) the "relative sophistication and bargaining power of the [affected] consumers," and (3) "evidence that the challenged practice has previously impacted other consumers or has the significant potential to do so in the future."  *Rocky Mountain Rhino Lining*, 62 P.3d at 149.  When a challenged trade practice affects "only a small fraction" of the entity's consumers, the impact on the public is not "significant" under the CCPA.  *Peterson v. USAA Life Ins. Co*., 353 F. Supp. 3d 1099, 1113 (D. Colo. 2018) (citing *Rocky Mountain Rhino Lining*, 62 P.3d at 150).

The Firefly defendants argue that Warming Trends has no admissible evidence that any of the alleged misrepresentations had a significant impact on the public. Docket No. 274 at 23-24.  The Firefly defendants assert that this case is similar to *Benton v. Avedon Engineering, Inc.*, No. 10-cv-01899-RBJ-KLM, 2012 WL 5866303 (D. Colo. 2012).  *Id*.  In *Benton*, the court held that "[t]he mere fact that displays at trade shows and on websites can be, and presumably are, viewed by numerous people is not enough" to satisfy the public impact requirement; "[t]here has to be some indication that there was a significant impact on the public."  *Benton*, 2012 WL 5866303, at *6. Warming Trends argues that there is a genuine issue of material fact as to whether the public was harmed by the defendants' false statements regarding the patent status of their products because "in most circumstances, where a defendant's misrepresentations are in the form of an advertisement directed generally to the public as potential or actual consumers, a significant public impact is presumed."  Docket No. 301 at 24 (citing *Francis v. Mead Johnson & Co.*, No. 10-cv-00701-JLK, 2010 WL 5313540, at *6 (D. Colo. Dec. 17, 2010)).

The Court finds that Warming Trends has failed to provide any evidence that the challenged practice significantly impacts the public.  Warming Trends has presented no evidence of the number of consumers directly affected by the statements at the HNA Expo or on the Firefly defendants' website.  *See generally* Docket No. 301; *Rocky Mountain Rhino Lining*, 62 P.3d at 149.  Warming Trends also fails to offer any evidence regarding the sophistication and bargaining power of the affected consumers or evidence that the challenged practice has previously impacted other consumers or has the significant potential to do so in the future.  *See generally* Docket No. 301; *Rocky*

*Mountain Rhino Lining*, 62 P.3d at 149; *Alpine Bank v. Hubbell*, 555 F.3d 1097, 1113 (10th Cir. 2009) (affirming grant of summary judgment where the record contained no evidence that the representation harmed other customers in the past or is likely to do so in the future); *Johnstown Feed & Seed, Inc. v. Continental Western Ins. Co.*, 641 F. Supp. 2d 1167, 1181 (D. Colo. 2009) (granting summary judgment where plaintiff failed to provide any evidence of the number of customers affected by the deceptive practice or the relative sophistication of the customers).

Warming Trends relies on *Francis* to suggest that the Court can presume a significant public impact when the misrepresentations are advertisements directed at the public.  Docket No. 301 at 24.  However, *Francis* addressed the public impact element at the motion to dismiss stage, not the summary judgment stage.  *See Francis*, 2010 WL 5313540, at *6.  Courts in this district have held that, at the summary judgment stage, a plaintiff cannot rely solely on the existence of misleading statements at tradeshows or online to establish the public impact element.  *See Benton*, 2012 WL 5866303, at *6 (holding that "[t]he mere fact that displays at trade shows and on websites can be, and presumably are, viewed by numerous people is not enough"); *Examination Bd. of Professional Home Inspectors v. Int'l Assn. of Certified Home Inspectors*, 519 F. Supp. 3d 893, 920 (D. Colo. 2021) (holding that "the fact that numerous people heard or saw these statements [on the website] is insufficient" to establish public impact); *RV Horizons, Inc. v. Smith*, No. 18-cv-02780-NYW, 2020 WL 6701119, at *29-30 (D. Colo. Nov. 13, 2020) (holding that "the mere availability of the challenged statements on the website is not enough to establish public impact" and plaintiff failed to adduce any evidence of the number of affected consumers or their

relative sophistication or bargaining power).  Warming Trends has failed to offer sufficient evidence to create a genuine issue of material fact on the public impact element.  Accordingly, the Firefly defendants are entitled to summary judgment on the CCPA claim.

### 8.  *Unfair Competition Claim*

Under Colorado law, the tort of unfair competition requires proof that (1) "the defendant has copied the plaintiff's products or services or misappropriated plaintiff's name or operations in some regard" and (2) "this conduct is likely to deceive or confuse the public because of the difficulties in distinguishing between the plaintiff's and defendant's products and services."  *Wells Fargo Insurance Servs. USA, Inc. v. McQuate*, 276 F. Supp. 3d 1089, 1117 (D. Colo. 2016).  The Firefly defendants argue that there is no evidence that any of the alleged misrepresentations are likely to deceive or confuse the public.  Docket No. 274 at 25.  In its response, Warming Trends does not address the Firefly defendants' arguments or discuss its claim for unfair competition.  *See generally* Docket No. 301.  A plaintiff's failure to address a claim in a response to a motion for summary judgment is proper grounds to grant summary judgment in the defendant's favor.  *See Hinsdale v. City of Liberal, Kan.*, 19 F. App'x 749, 768-69 (10th Cir. 2001) (unpublished) (affirming district court's holding that plaintiff abandoned his equal protection claim by failing to address the claim in his response to the summary judgment motion).  The Court accordingly grants summary judgment on this claim.

### B.  Warming Trends' Motion for Summary Judgment

Warming Trends requests partial summary judgment on its claims for: 1) breach of contract against Mr. Stone and 2) false marking under 35 U.S.C. § 292 against the Firefly defendants.  Docket No. 276 at 1.

### 1.  Breach of Contract Claim

Warming Trends moves for summary judgment on the issue of whether Mr. Stone committed at least one breach of the 2018 Agreement between April 2, 2018 to April 2, 2019 and therefore triggered the additional one-year extension of the 2018 Agreement.  Docket No. 276 at 3.

### a.  Enforceability of the Non-Compete Agreement

As an initial matter, the Firefly defendants argue that there is a disputed issue of fact regarding the enforceability of the non-compete agreement, which precludes summary judgment.  Docket No. 293 at 11.  As previously noted, Colorado public policy strongly disfavors non-compete agreements.  *See Findlay*, 923 P.2d at 302; *Crocker*, 463 P.3d at 866.  Under Colorado law, covenants not to compete are void, unless they fall within a statutory exception.  Colo. Rev. Stat. § 8-2-113(2*); see also KeyBank Nat'l Ass'n v. Williams*, No. 19-cv-03714-CMA-SKC, 2022 WL 684165, at *3 (D. Colo. Mar. 7, 2022).  "[T]he employer has the burden to establish that the covenant not to compete falls within one of those narrow exceptions."  *DigitalGlobe, Inc. v. Paladino*, 269 F. Supp. 3d 1112, 1120 (D. Colo. 2017) (quoting *Phoenix Capital, Inc. v. Dowell*, 176 P.3d 835, 840 (Colo. App. 2007)).  The statutory exceptions allow non-compete agreements for the protection of trade secrets, for the purchase and sale of a business or business assets, for executive and management personnel, and for the recovery of training

expenses for certain employees.  *Nat'l Graphics Co. v. Dilley*, 681 P.2d 546, 546-47

(Colo. App. 1984).[16]  Additionally, non-compete agreements must be reasonable as to

both duration and geographic scope.  *Id.* at 547; *Nutting v. RAM Southwest, Inc.*, 106 F.

Supp. 2d 1121, 1127 (D. Colo. 2000*); Energex Enterprises, Inc. v. Anthony Doors, Inc*.,

250 F. Supp. 2d 1278, 1283 (D. Colo. 2003).

Warming Trends argues that three statutory exceptions apply to Mr. Stone's non-

compete agreement: "(1) covenants for executive personnel, (2) covenants for the

protection of trade secrets, and (3) covenants for the sale of business assets."  Docket

No. 276 at 15-16.  In response, the Firefly defendants assert that all three exceptions

are disputed.  Docket No. 293 at 11 n.2.  The Firefly defendants dispute that Mr. Stone

qualified as "executive management personnel" when the 2015 Agreement was signed

because they argue he was "ex-communicated" from the business, had no role in day-

to-day operations, and no management responsibilities.  *Id.* at 8, ¶ 2; 11 n.2.  However,

it is undisputed that Mr. Stone was the president of Rock in 2015 when he signed the

2015 Agreement.  Docket No. 276 at 4, ¶¶ 2-3.  The non-compete agreement therefore

falls under the statutory exception for executive and management personnel.

Next, the Firefly defendants argue that the non-compete agreement is

unreasonable because it contains no geographic limitation and its worldwide scope is

unreasonable.  Docket No. 293 at 11-13.  Warming Trends argues that Mr. Stone

---

[16] Effective August 10, 2022, the Colorado legislature amended the statute governing
non-compete agreements and revised the statutory exceptions.  *See* H.B. 22-1317,
codified at Colo. Rev. Stat. § 8-2-113.  However, the new law only applies to covenants
not to compete entered into or renewed on or after the effective date of the act.  H.B.
22-1317, § 2(2).  Accordingly, the Court will evaluate Mr. Stone's agreement under the
four statutory exceptions discussed in *Dilley*.  *See Dilley*, 681 P.2d at 546-47.

should be barred from asserting an unenforceability defense because he failed to raise this affirmative defense in his answer, discovery responses, or his own motion for summary judgment.  Docket No. 308 at 3.  Warming Trends further argues that Mr. Stone, while represented by counsel, has repeatedly agreed to the non-compete provision and never raised geographic unenforceability when executing the 2015, 2017, and 2018 Agreements.  *Id*. at 2-3.  Warming Trends maintains that allowing "Mr. Stone to raise his novel unenforceability defense at this late stage would be prejudicial to Warming Trends" because it has not had the opportunity to conduct discovery into the intended geographic scope of the non-compete agreement.  *Id*. at 3.

Unenforceability of a contract is generally treated as an affirmative defense.  *See Bartch v. Barch*, No. 18-cv-3016-MSK-NYW, 2020 WL 7055442, at * 5 (D. Colo. Nov. 30, 2020).  Fed. R. Civ. P. 8(c) requires a party to set forth affirmatively all matters which it intends to use as an affirmative defense in responding to a pleading.  Generally, the failure to plead an affirmative defense results in a waiver of that defense.  *Buckles Mgmt., LLC v. InvestorDigs, LLC*, 728 F. Supp. 2d 1145, 1149 (D. Colo. 2010).  However, the "Tenth Circuit has held that the purposes behind the notice pleading requirements are served if the plaintiff is put 'on notice well in advance of trial that defendant intends to present a defense in the nature of an avoidance.'"  *Id*. (quoting *Ball Corp. v. Xidex Corp*., 967 F.2d 1440, 1443 (10th Cir. 1992)).  In the absence of a showing of prejudice, an affirmative defense may be raised for the first time in a summary judgment motion.  *Id*.

Here, the Firefly defendants did not plead unenforceability as a defense to the breach of contract claim in their answer.  *See generally* Docket No. 229.  The Firefly

defendants also did not argue unenforceability in their own motion for summary judgment, which was filed before Warming Trends' motion for summary judgment. *See generally* Docket No. 274. The Firefly defendants raised geographic unenforceability for the first time in their response to Warming Trends' motion for summary judgment. Docket No. 293 at 11-13. Mr. Stone agreed to the terms of the non-compete agreement three times, while represented by counsel, and never raised unenforceability as an issue. *See* Docket No. 308 at 2-3. The Firefly defendants provide no legal argument for why the Court should allow Mr. Stone to raise an unenforceability defense at this late stage in the proceedings. *See generally* Docket No. 293. The Court finds that Warming Trends would suffer prejudice, for the reasons Warming Trends claims, if the Court allowed Mr. Stone to raise the defense at this stage. Accordingly, the Court finds that Mr. Stone waived the unenforceability argument.[17]

The Court therefore will evaluate each of plaintiff's arguments regarding Mr. Stone's alleged individual breaches of the non-compete agreement.

### b. Brass Burners

Warming Trends argues that Mr. Stone breached the non-compete agreement by acquiring pricing information from potential manufacturers, creating and sending

---

[17] Even if Mr. Stone did not waive the argument, the Court would find that the non-compete provision is reasonably limited in geographic scope. Although the 2015 Agreement does not contain an explicit geographic limitation, the agreement states that Mr. Stone cannot "work for, engage or invest in, directly or indirectly, in a business competitive with Rock Enterprises, Inc." Docket No. 274-10 at 2. The non-compete agreement is limited to the geographic locations where Warming Trends competes. Warming Trends cites evidence that Warming Trends only sells products in the United States, Canada, Mexico, and the United Arab Emirates. Docket No. 308 at 4. The Firefly defendants admit that "95% or more of Rock's sales were within the United States." Docket No. 293 at 12. Accordingly, the non-compete agreement has a reasonable geographic limitation encompassing a few countries.

drawings of burners to manufacturers, and soliciting future business partners and investments.  Docket No. 276 at 12-13, 14-15.  Because the Court granted the Firefly defendants' motion for summary judgment on these allegations, the Court denies this portion of Warming Trends' motion.

### c.  Steel Logs

Warming Trends also asserts that Mr. Stone breached the non-compete agreement by manufacturing and selling steel log sets during the restricted period in direct competition with Warming Trends.  *Id*. at 13-14.  In response, the Firefly defendants argue that no one understood the non-compete provision as modified by the 2017 Agreement to cover steel log sets.  Docket No. 293 at 15.  The Firefly defendants assert that Mr. Stone had been selling steel logs since 2016 with Rock's approval and the parties amended the 2015 Agreement to clarify that the non-compete did not cover steel logs, but only applied to burners.  *Id*.  The Firefly defendants argue that the 2017 Agreement amended the non-compete provision and "(1) permitted Stone to install but not fabricate or manufacture firepits (which includes steel log sets), and (2) attempted to make clear that the [n]oncompete only applied to competition related to brass burners."  *Id*.

The 2015 Agreement prohibits Mr. Stone from working for a "business competitive" with Rock.  Docket No. 274-10 at 2.  The 2017 Agreement states that all the obligations set forth in the 2015 Agreement remain in effect with three specific exceptions:

> a) the Non-Solicitation/Non-Compete portion of the agreement shall expire January 11, 2019; b) Ray Stone and Firefly may continue to install firepits but they shall not fabricate or manufacture; and c) Ray Stone and Firefly may market the portable firepit product and m[a]y procure elements of that product

42

> from any source so long as no part of the portable firepit replicates Rock
> Enterprises, Inc. burners.

Docket No. 274-11 at 2.  The 2017 Agreement allows Mr. Stone to install firepits, but

prohibits him from manufacturing firepits.  *Id*.  The Firefly defendants admit that firepits

include "steel logs."  Docket No. 293 at 15.  Accordingly, the non-compete agreement

prohibits Mr. Stone from manufacturing steel logs.

It is undisputed that Warming Trends sold steel log sets during Mr. Stone's

employment with the company through the present day, and Mr. Stone was aware of

these facts.  Docket No. 276 at 6-7, ¶ 17.  The Court finds that it is undisputed that Mr.

Stone was manufacturing and offering steel log sets for sale by September 2018.  *Id*. at

6, ¶ 16.  Citing Mr. Stone's declaration, the Firefly defendants dispute that Mr. Stone

manufactured steel log sets and argue that he only "purchased steel log sets from a

manufacturer in Mexico."  Docket No. 293 at 5, ¶ 16 (citing Docket No. 293-2 at 3, ¶ 5).

The Court finds that paragraph five of Mr. Stone's declaration is an attempt to

raise sham facts to defeat summary judgment.  In *Ralston v. Smith & Nephew Richards,*

*Inc.*, 275 F.3d 965 (10th Cir. 2001), the Tenth Circuit held that the district court did not

abuse its discretion in excluding an affidavit that "directly contradicted certain positions

previously taken by [the affiant] and which were detrimental to [plaintiff's] sole remaining

cause of action" because the circumstances supported a conclusion that the affidavit

sought to create a "sham fact issue."  275 F.3d at 973 (emphasis omitted).  In reaching

that conclusion, the court identified three factors relevant to "whether a contradicting

affidavit seeks to create a sham fact issue": (1) whether "the affiant was cross-examined

during his earlier testimony"; (2) whether "the affiant had access to the pertinent

evidence at the time of his earlier testimony or whether the affidavit was based on newly

discovered evidence"; and (3) whether "the earlier testimony reflects confusion which the affidavit attempts to explain." *Id*. (citation omitted). However, before applying the *Ralston* factors, a court must determine whether the affidavit at issue directly contradicts the previous deposition testimony. *See Knitter v. Corvias Military Living, LLC*, 758 F.3d 1214, 1218 n.3 (10th Cir. 2014) (holding that witness's affidavit did not "fit[] the sham affidavit paradigm" because it did not "contain any allegations that would directly contradict [the witness's] earlier deposition testimony" (internal quotation marks omitted)).

Warming Trends cites an email from Mr. Stone to Chad Hetherington on September 6, 2018, where Mr. Stone stated "[a]t this point we manufacture steel logs for the same industry." Docket No. 276 at 6, ¶ 16; Docket No. 276-11 at 2. At his deposition, Mr. Stone testified that he was manufacturing steel log sets in September 2018. Docket No. 276-9 at 17, 200:23-201:9. Specifically, the following questions and answers took place:

> Q. And the next paragraph, it starts, "At this point, we manufacturer steel logs for the same industry." Do you see that?
>
> A. Yep. I started manufacturing those immediately.
>
> Q. Okay. So this -- at this point, you were already manufacturing steel logs, right?
>
> A. Yes, I was.
>
> Q. And when I say "at this point," I'm referring to September 2018, right?
>
> A. Yes.

*Id*. In contrast, in Mr. Stone's declaration, attached to the Firefly defendants' response, Mr. Stone states that, "I purchased steel log sets from a manufacturer in Mexico to sell

through my retail and installation business."  Docket No. 293-2 at 3, ¶ 5.  The Court

finds that paragraph five of Mr. Stone's declaration directly contradicts his deposition

testimony.  The Court now turns to the *Ralston* factors.  The Court finds that Mr. Stone

was cross-examined about the manufacturing of steel log sets, that he had access to

the email at the time of his testimony, and that he was not confused about the meaning

of the term "manufacturing" during his deposition.[18]  As a result, the Court finds that

paragraph five of Mr. Stone's declaration is an attempt to raise sham facts to defeat

summary judgment.  That paragraph will therefore be disregarded.

The undisputed evidence shows that Mr. Stone was manufacturing steel log sets

for sale by September 2018.  Docket No. 276 at 6, ¶ 16 (citing Docket No. 276-11;

Docket No. 276-9 at 17, 200:23-201:9).  By manufacturing steel log sets, Mr. Stone

violated section b of the 2017 Agreement.  *See* Docket No. 274-11 at 2.  As a result, the

Court grants summary judgment in favor of Warming Trends that Mr. Stone violated the

non-compete agreement by manufacturing steel log sets.[19]

---

[18] In fact, throughout Mr. Stone's deposition, he repeatedly affirmed that he
manufactured steel log sets.  *See* Docket No. 293-3 at 6, 14-15, 201:10-18, 348:18-
349:4, 350:16-24.

[19] In a footnote, the Firefly defendants state that Warming Trends identified the alleged
steel logs breach "for the first time when they submitted their expert report on May 6,
2022 (after the close of discovery).  The issue was not raised in Plaintiff's discovery
responses or by its 30(b)(6) witness despite questions about the basis for Plaintiff's
claim."  Docket No. 293 at 15 n.5.  The Firefly defendants provide no legal argument in
this footnote.  *See generally id.*  Under Fed. R. Civ. P. 37(c)(1), a party that fails to
provide information as required by Rule 26(a) or (e) is not allowed to use that
information to supply evidence on a motion or at trial "unless the failure was
substantially justified or is harmless."  The Court declines to analyze this issue under
Fed. R. Civ. P. 37(c)(1) because the Firefly defendants raised the issue in a perfunctory
manner and failed to provide any legal argument.  *See United States v. Wooten*, 377
F.3d 1134, 1145 (10th Cir. 2004) ("The court will not consider . . . issues adverted to in
a perfunctory manner, unaccompanied by some effort at developed argumentation.").

### d. Disclosure of the Existence of the Non-compete Agreement

Warming Trends argues that Mr. Stone breached his contract by disclosing the existence of his non-compete agreement.  Docket No. 276 at 14.  It is undisputed that, around September 2018, Mr. Stone told Chad Hetherington that he had a non-compete agreement with Warming Trends.  *Id*. at 7, ¶ 18.  The confidentiality provision in the 2018 Agreement, signed in May 2018, states that "[t]he existence and terms of this Agreement will be kept confidential."  Docket No. 274-12 at 5.

The Firefly defendants argue the confidentiality provision is ambiguous and that the parties did not intend to prevent Mr. Stone from disclosing the existence of his non-compete agreement.  Docket No. 293 at 16.  The Court disagrees.  The language of the confidentiality provision is unambiguous.  The 2018 Agreement states that "[t]he existence and terms of this Agreement will be kept confidential."  Docket No. 274-12 at 5.  The terms of the 2018 Agreement include the non-compete provisions of the 2015 and 2017 Agreements.  *Id*. at 2.  Accordingly, the confidentiality provision prohibits Mr. Stone from disclosing the existence of his non-compete agreement.  The Court therefore will not evaluate the conduct of the parties.  Finally, the Firefly defendants argue that "demanding that Stone could not tell people when he can work with them is an unreasonable restraint on competition."  Docket No. 293 at 16.  The Firefly defendants provide no legal argument in support of this contention.  As a result, the Court declines to consider this argument.

The Court grants summary judgment in favor of Warming Trends that Mr. Stone violated the confidentiality provision of the 2018 Agreement by disclosing the existence of his non-compete agreement to Chad Hetherington.

### e. One Year Extension of the Restricted Period

Warming Trends requests that the Court grant summary judgment that each of Mr. Stone's breaches of the 2018 Agreement between April 2, 2018 to April 2, 2019 triggered the additional one-year extension of the 2018 Agreement. Docket No. 276 at 17-18. The 2018 Agreement states that the non-compete provisions of the 2015 and 2017 Agreements "remain in full force and effect until April 2, 2019 (the 'Restricted Period')." Docket No. 274-12 at 2. The 2018 Agreement states that the "[p]arties agree that a breach of the Agreements by Stone within the Restricted Period shall extend the Restricted Period for an additional 365 days." *Id*. at 3.

The Firefly defendants only argue that the extension is unenforceable based on their prior arguments that the 2018 Agreement is unenforceable. The Court previously rejected this argument and found that the non-compete agreement is valid under the statutory exceptions.

Accordingly, because the Court found that Mr. Stone breached the 2018 Agreement by manufacturing steel logs sets and disclosing the existence of his non-compete agreement, the Court finds as a matter of law that these breaches triggered the extension of Mr. Stone's restricted period to April 1, 2020. *See id*. at 2-3.

### 2. False Marking

Because the Court granted the Firefly defendant's motion for summary judgment on the false marking claim, the Court denies Warming Trends' motion for summary judgment on this claim.

IV.     **CONCLUSION**

It is therefore

**ORDERED** that the Firefly Defendants' Motion for Summary Judgment [Docket

No. 274] is **GRANTED in part** and **DENIED in part**.  It is further

**ORDERED** that Plaintiff Warming Trends, LLC's Motion for Summary Judgment

[Docket No. 276] is **GRANTED in part** and **DENIED in part**.

DATED March 30, 2023.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge